**Chad Leroy LISDAHL, Plaintiff,**

v.

**MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH, d/b/a Mayo Medical Transport, a/k/a Gold Cross Ambulance, and David B. Johnson, individually, Defendants.**

**Civ. No. 07–3708 (RLE).**

United States District Court,
D. Minnesota.

Feb. 1, 2010.

George C. Aucoin, The Law Offices of George C. Aucoin, APLC, Metairie, LA, Kenneth A. Kimber, Hanft Fride PA, Duluth, MN, for Plaintiff.

Gregory J. Griffiths, Dunlap & Seeger, Rochester, MN, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

RAYMOND L. ERICKSON, United States Chief Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to the parties' consent, see, *Title 28 U.S.C. § 636(c)*, for the conduct of a Bench Trial. The Trial commenced on August 24, 2009, and concluded on August 27, 2009. Thereafter, the parties simultaneously submitted post-Trial briefs, with the last such brief having been filed with the Court on September 30, 2009, at which time, the matter was taken under advisement. At the time of Trial, the Plaintiff Chad Leroy Lisdahl ("Lisdahl") appeared by George C. Aucoin, Esq., and the Defendants Mayo Foundation for Medical Education and Research, d/b/a Mayo Medical Transport, a/k/a Gold Cross Ambulance ("Gold Cross"), and David B. Johnson ("Johnson"), appeared by Gregory J. Griffiths, Esq.

This action centers upon Lisdahl's contention that the Defendants violated his rights under the Uniformed Services Employment and Reemployment Act of 1994, Title 38 U.S.C. §§ 4301, *et seq.* ("USERRA"). Specifically, Lisdahl claims that the Defendants unlawfully compelled him to complete a pre-work screening ("PWS"), and an employment orientation; improperly required him to renew his certification with the National Registry of Emergency Medical Technicians ("National Registry"); failed to promptly reemploy him in the same position that he had held prior to his extended Military Leave; failed to promote him consistent with his seniority; and all this in retaliation, and with the intent to discriminate against him, on the basis of his military service. In addition, Lisdahl alleges that the Defendants, and Johnson in particular, created a hostile work environment that eventually led to his constructive discharge.

The Defendants deny any violation of USERRA, and contend that Lisdahl returned to his prior position as soon as practicable under the circumstances, that he was not discriminated against on the basis of his military service, in any of the ways that he has alleged, and they maintain that his termination of employment was solely the product of his own voluntary quit.

Based upon the entirety of the Record before us, the files, Exhibits, and arguments of counsel, and being fully advised in the premises, we now make our Findings of Fact, and Conclusions of Law, as follows:

### II. *Findings of Fact*

1. Gold Cross provides ambulance services to eleven (11) or so localities, inclusive of the Duluth, Minnesota, and Superior, Wisconsin, geographic areas. In the Duluth–Superior area, Gold Cross employs approximately fifty (50) paramedics, many of whom either are, or were, members of the military services during portions of their employment with Gold Cross. In the mid-to-late 1990's, Gold Cross sought to become more effective, and efficient in its business operations, through its corporate structure. This effort resulted in corporate-wide regulations and policies, and the

development of a standardized method for progressing new hires, as well as those who were returning to the company's employ, through a proficiency of medical care, so as to allow the employee to attain "status" level.

2. A status Paramedic is able to be partnered with a nonstatus, or another status Paramedic; whereas, a nonstatus Paramedic could only respond to medical emergencies while in the company of a status Paramedic. In the view of Gold Cross' management, an insistence upon employing status Paramedics best served the medical needs of the public, the professional needs of the Paramedics, and of Gold Cross' Medical Director, and assured the highest level of patient care. Since as long as any witness could remember, Gold Cross has also insisted upon having each Paramedic, who is in its employ, attain and maintain certification with the National Registry.

3. Lisdahl was first introduced to Gold Cross' operations during a ride-along that he undertook as a part of his training in Fire Technology. See, *Defendant Exh. 1*, at p. 2076.[1] He liked that experience, and matriculated at Hibbing Community College in an instruction program for Paramedic Technology. *Id.* After fourteen (14) months in that program, Lisdahl graduated, and thereafter, in May of 1999, he received his certification from the National Registry. See, *Plaintiff Exh. 30.* Subsequently, in October of 1998, Lisdahl accepted employment with Gold Cross as a "Med Cab Driver" in Gold Cross' Duluth location, where he provided intra-facilities transfers for, among others, those patients who were restricted to a wheelchair. *Id.* at p. 2066. Then, in June of 1999, Lisdahl accepted a position at Gold Cross as a part-time Paramedic, again working at the Duluth location. *Id.* at p. 2058. In due course, Lisdahl obtained a full-time Para-medic position at Gold Cross, *id.* at p. 2023, and then, according to Lisdahl, he secured "status" standing within six (6) months thereafter.

4. By all accounts, Lisdahl was an exemplary Paramedic, and his work in that field was respected by his co-employees, by Johnson, and by all of the members of Gold Cross' management team. He appears to have secured his pay raises as they were due, and he maintained his professional accreditations through the completion of appropriate programs of continuing education. During the period from 2000 to 2002, Lisdahl was working a standard schedule for a Paramedic, with two (2) twenty-four (24) hour shifts, followed by five (5) days when he was not working. He testified that he loved the work, and that he was never the subject of any complaint. In that same period of time, Lisdahl functioned as the Assistant Team Captain to Roger Swor ("Swor"), who was the Team Captain on the B Shift.

5. In 2002, Lisdahl decided to enter the United States Marine Corps, and his last day of work at Gold Cross was on October 2, 2002. *Id.* at p. 2018. During the following four (4) years, Lisdahl served his country in three (3) tours of duty, as a Marine infantry man, in the armed conflict in Iraq. His service commenced as a Private but, over the course of his service, he was promoted through Private First Class, and Corporal, to the rank of Sergeant.

6. Lisdahl recalled conferring with Douglas Haffield ("Haffield"), who is Gold Cross' Assistant Coach for Education, before Lisdahl went on active duty. Lisdahl recalled that Haffield had impressed upon him the need to maintain his Minnesota licensure as a Paramedic. According to Lisdahl, this required that he continue with certain educational and training pro-

---

1. Where appropriate, we cite to the "Bates" number on a multi-page Exhibit we reference.

grams, for which he incurred unspecified expense, but that he never requested reimbursement from Haffield. Lisdahl testified that he did not recall Haffield advising him that it would be extremely difficult to maintain certification with the National Registry, owing to the fact that the certification required training programs which, in all likelihood, would not be available to Lisdahl while deployed, as well as the need for verification of training, and proficiency, by Gold Cross' Medical Director. Lisdahl flatly denied that Haffield informed him that the National Registry had a military liaison for those in the military services.

7. In contrast, Haffield testified that he specifically recalled informing Lisdahl to maintain his Minnesota Paramedic's license, since maintaining his certification with the National Registry would be extremely difficult. Haffield also specifically recalled advising Lisdahl that the National Registry retained a military liaison for service members, in order to assist in any attempt to maintain a Paramedic's certification. According to Haffield, while National Registry certification was difficult to maintain, if Lisdahl maintained his Minnesota licensure, then he would be qualified to retake the examinations for recertification by the National Registry.[2] Given this conflict in the testimony, we credit Haffield's recollection for several reasons.

8. First, Lisdahl did not deny having a conversation with Haffield about the maintenance of his qualifications to be a Paramedic. While Lisdahl did not recall any reference to the National Registry certification, or to a military liaison with the National Registry, Haffield testified, we believe credibly,[3] that the conversation, with its referenced content, did occur. Second, Lisdahl did, in fact, forward to Haffield, in March of 2005, an application for recertification by the National Registry, together with a personal check to cov-

---

**2.** The Record is uncontested that, in order to obtain a Minnesota Paramedic license, the applicant had to pass an examination, by the National Registry, so as to secure a certification of proficiency by that independent organization. However, once the Minnesota license is obtained, National Registry certification need not be retained in order to continue to be qualified under Minnesota's Paramedic license. The Record is also clear that, apart from that requirement under Minnesota law, neither Minnesota, nor any Federal regulatory agency, required certification by the National Registry. Rather, Gold Cross insisted on that certification in order to assure the highest level of medical and patient care, since the certification served as a verification, by an independent reviewing agency, that those being certified were properly trained, and accredited, to serve the public as a Paramedic.

**3.** We make plain that, as is the frequent circumstance when rendering believability judgments, both the testimony of Lisdahl, and Haffield, presented facially plausible renditions of the facts. Here, in resolving the conflict, we have assessed the demeanor, and tonal inflections of each witness, their respective deportment, their bias or financial interest in the outcome, the inherent consistency, or inconsistency, of their testimony under the circumstances, in addition to their contemporaneous writings and actions, or inaction, as well as their general capacity to tell the truth. As we later detail, we generally find Lisdahl to be a less than exacting historian, as his testimony was, on frequent occasion, internally inconsistent, at odds with the evidence as a whole, or was contradicted by contemporary writings or sworn averments. See, e.g., *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)("[O]nly the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."), citing *Wainwright v. Witt*, 469 U.S. 412, 428 and n. 9 and 10, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Given the length of the Trial proceedings, we were afforded the opportunity to closely observe the witnesses during both direct, and cross examination, and our believability judgments were informed, in no small part, by our ability to assess their testimony personally, as well as in the context of the evidence in the Record as a whole.

er the requisite fee,[4] but the application was so fatally incomplete that Haffield considered it futile to transmit those papers to the National Registry, and decided not to do so.[5] See, *Plaintiff Exh. 35.* Absent Haffield's advisory, we find it unlikely that Lisdahl would have forwarded an application, albeit an incomplete one, to Haffield as a part of Lisdahl's personal effort to maintain his certification at the National Registry.

9. While still on Military Leave, Lisdahl underwent surgical procedures on each of his knees; the first in May of 2006, and the second in June of 2006. According to Lisdahl, he was released from active duty on August 6, 2006, with a separation date of October 7, 2006. See, *Plaintiff Exh. 57.* Notwithstanding his contention, that he was available for reemployment by Gold Cross on August 1, 2006, we are persuaded that Lisdahl, and Darla K. Oelkers ("Oelkers"), who is the Human Resources Manager at Gold Cross, reached an agreement as to an appropriate return to work date, that was consistent with Lisdahl's personal needs and choices. In an email dated July 24, 2006, Lisdahl wrote, in relevant part, as follows:

Darla,

I plan on being back to Superior NLT [i.e., no later than] the 8th or 9th of August. Would I still be able to make it to orientation in August, and when will I be able to get in for my work screen? * * * Anything else I can do on my end to make the transition easier, please let

me know. I appreciate your help and accomadations [sic] very much, thanks again.

Chad Lisdahl [employee no. 1310]

*Plaintiff Exh. 25.*

Oelkers responded, in relevant part, as follows:

Hi Chad,

Sorry I haven't gotten back to you sooner * * * I was waiting to hear if our orientation session would be on schedule in August. The orientation for August has been cancelled. The next orientation session is scheduled for September 12–15. You will need to complete the PWS [i.e., Pre–Work Screen] prior to attending the orientation session. I understand that your moving van is scheduled for August 7th. Please provide me with a couple of dates in which you are available and I will set up a PWS accordingly. This will probably be in St. Cloud vs. driving all the way to Rochester.

*Id.*

On July 28, 2006, Lisdahl responded as follows:

Darla,

Im [sic] assuming I wont [sic] be able to start any kind of work until after the orientation, so if I can do my PWS either towards the end of August or early September that would help me out with getting settled in. The movers pick my stuff up on the 7th, but im [sic]

---

4. Lisdahl makes no claim that either Gold Cross, or Haffield, negotiated his personal check, and there is no proof, in fact, that the check was cashed, and Lisdahl could not recall what had happened to his check. In any event, there is no evidence in this Record that Lisdahl suffered any financial loss owing to his failed attempt to recertify with the National Registry.

5. Gold Cross' Standard Operating Guidelines require each Paramedic to maintain "his/her own certification(s); registration(s); licensure(s) as required by state, local and federal laws and rules as well as those listed in the team members applicable job description." *Defendant Exh. 6,* at p. 2300. Accordingly, while Haffield, and other staff members assist in the certification, and recertification process, each employee bears the responsibility of maintaining his or her certifications.

not sure when they will actually be arriving in Superior. This would then give me a little time to close on the house we're buying and get all of my stuff out of storage, etc. So those timeframes would work for me, but Im [sic] willing to do whatever is best for the company, you all have helped me out so much during all of this, so if the PWS needs to be done asap ill [sic] do it, if not im [sic] open to any dates in those windows. Thanks again.

Chad

*Plaintiff Exh. 24.*

Oelkers then replied:

Yes, you are correct, you will not be able to work until you have completed orientation. I'll see what date works best for the P.T. giving the test and will get back to you.

*Id.*

Oelkers testified to her belief, that she and Lisdahl reached an accord on his return to work date which accommodated Lisdahl's expressly stated need to settle into his new home, after an approximately four (4) year hiatus from both his employment at Gold Cross, and a residence in the Duluth–Superior area. According to Oelkers, at no time did Lisdahl advise her that the agreed upon return to work date was unacceptable. Although, at Trial, Lisdahl testified that he was not paid by Gold Cross in August of 2006, he never credibly disagreed with Oelker's testimony, which we find to be believable in all respects.

10. Consistent with the agreement reached with Oelkers, Lisdahl successfully completed a PWS on August 31, 2006. As admitted by Oelkers, she had erred in not paying Lisdahl for his time and travel to the PWS, but that he was fully compensated for the PWS nearly a year later, in August of 2007. See, *Plaintiff Exh. 26.* Admittedly, Oelkers, and therefore, Gold Cross erred in not immediately paying Lisdahl for the time and travel he expended in completing the PWS, but he has presented no other out-of-pocket expenses, which were not paid by Gold Cross, nor has he adduced any evidence that the initial failure to pay him was the result of any anti-veteran animus by either Oelkers, or Gold Cross generally. On this Record, after Lisdahl was paid for the time and travel to the PWS, any prior damage for that exercise was made whole.

11. While it was anticipated that Lisdahl would undergo his employment orientation during the last week in August of 2006, that orientation session was cancelled, apparently for want of sufficient participants, and Lisdahl was scheduled to undertake his orientation on the next available setting, which commenced on September 12, 2006, at which time, he was placed on Gold Cross' payroll. See, *Plaintiff Exh. 27.* Although not argued by Lisdahl, we find nothing unreasonable in Gold Cross' effort to assure that Lisdahl was physically capable of returning to the physically demanding work of a Paramedic, particularly after he had undergone double knee surgeries in the distant past, and that he was reoriented to work as a Paramedic, owing to his absence over a four (4) year period, as well as the intervening computer, equipment, and work procedures changes.[6] As testified by Lisdahl, his orientation session was not well-attended, and was completed over the course of four (4) days.

12. In view of the foregoing, and notwithstanding Lisdahl's claim to the contrary, on the basis of a preponderance of the competent and credible evidence, we

6. Lisdahl adduced no proof that the conduct of a PWS, or job orientation, was limited to him, and was not required of others.

find that Lisdahl was "promptly" reemployed by Gold Cross, see, *Title 38 U.S.C. § 4313*, following his release from active duty, since he was returned to work "as soon as practicable under the circumstances," see, *20 C.F.R. § 1002.181.* consistent with his preferred return to work date.[7]

13. Upon his completion of orientation, Lisdahl was returned to his last held position with Gold Cross, which was as an Assistant Team Captain for Swor. According to Oelkers, Lisdahl was returned to the same pay, and with the same seniority, as he held before he took Military Leave, and with any intervening pay increases. Lisdahl does not demonstrate that his pay or seniority were different than when he left, but he contends that he was returned on a nonstatus level, and was now obligated to share his former position, as an Assistant Team Captain, with Mark Mathison ("Mathison"). Both contentions are true.

14. As recounted in the testimony of Dr. John B. Schrock, who is, and has been, Gold Cross' Medical Director since 1978, Paramedics are not independent medical practitioners, but solely function under his medical license. As the Medical Director, he is responsible for quality of service from a medical standpoint, and for instituting programs for quality assurance. In conjunction with Gold Cross, Dr. Schrock has established a program to assure that beginning Paramedics, as well as those returning to service after lengthy leaves, are proficient in their medical skills and service, by requiring that each such Paramedic achieve a status level of performance. In order to gain status standing, a nonstatus Paramedic must have sufficient medical and professional training, through classroom educational opportunities, as well as on-the-job training, as observed and evaluated by a status Paramedic, and ultimately, the nonstatus Paramedic must successfully complete a personal and professional examination by Dr. Schrock. Dr. Schrock was adamant that he has not, and will not, deviate from that prior practice as the Medical Director of Gold Cross.

15. Upon his return to Gold Cross, Lisdahl was categorized as a nonstatus Paramedic, which required that he complete the same progression to a status level as all Paramedics who are new to the company, or who are returning from an extended leave of absence. We have been presented with no evidence of any deviation from that practice, whether the leave was owing to military service, or otherwise, and the same progression is required of trained and licensed Paramedics who transfer employment from another emergency response/ambulance company. According to Dr. Schrock,[8] in his professional judgment, when Lisdahl returned after military leave he was not ready to serve as a status

---

7. Even if we were to find that, at some conceivable point prior to his return to work, Lisdahl was available and ready to work, he has failed to identify that specific date, and has also failed to prove any specific loss of income, or other damage, owing to that claimed violation of the USERRA.

8. We found Dr. Schrock to be a credible and professionally competent expert witness. As recounted by him, he served in the Air Force, from 1971 to 1973, as a flight surgeon, completed approximately twenty-seven (27) years as an Emergency Room physician at St. Luke's Hospital, and has functioned as the Medical Director at Gold Cross since 1978. While every Paramedic witness called to testify expressed the view that requiring certification by the National Registry, as well as status Paramedic standing, were exacting standards of employment, no one criticized the requirements as unnecessary, or superfluous. Each employee of Gold Cross, and particularly the Paramedics, expressed unqualified pride in the professional standards of the company, and suggested not the slightest criticism of Dr. Schrock. Dr. Schrock acknowledged that his service as the Medical Director was governed by Minnesota Statutes, and that he followed those requisites closely.

Paramedic. Accordingly, it was the judgment of Gold Cross' management that Lisdahl be required to complete all of the requirements for becoming a status Paramedic, and we find nothing unreasonable, or reflective of anti-veteran animus, in that insistence, particularly in view of the collective goal of all of Gold Cross' employees, and its management, to provide the highest level of patient care.[9]

16. Lisdahl urges, however, that he was so well-qualified that he should have been elevated to the position of a status Paramedic well before he was. Given a preponderance of the competent and credible evidence, we find that contention unpersuasive. The Record discloses that, on November 2, 2006, Johnson sent the following email to Lisdahl, and Mathison, who, as we have noted, served as Lisdahl's field evaluator during Lisdahl's progression to status standing:

Hi Guys,

I met with Dr. Schrock today and we discussed Paramedic Status for Chad. He's comfortable with a status review at Chad's three month anniversary. The three of us need to sit down for a 3 month peer review and if all looks good, we'll proceed with Dr. Schrock. It's up to you guys to schedule the 3 month peer review. Just let me know as we approach the date.

Thanks,

Dave

*Defendant Exh. 35.*

Johnson testified that, notwithstanding this email, he did not hear back from either Mathison, or Lisdahl. Subsequently, in an email dated January 15, 2007, from Johnson to Mathison, and Lisdahl, among others, Johnson stated as follows:

Hi Chad,

Just looking for an update on your progress toward Paramedic Status. The three months as [sic] arrived and I think we should move forward. I spoke with Mark today and would like an update and an opportunity to review your Observation Reports. After that, you guys should pick a couple of dates and times we can meet for your 3 month Peer Review. Let me know what you think and touch base with Mark.

Thanks,

Dave

*Defendant Exh. 40.*

Later, on that same date, Lisdahl responded as follows:

Gentlemen,

I was going to wait until after I finished ACLS, PALS, BTLS, paramedic refresher, and re-cert training, in case Dr. Schrock had any questions or concerns about that end of it. Otherwise, I'm fine with any time frame that works best for everyone. Mark or Brad let me know works best for you, if sooner is better, I'm ready.

---

9. Lisdahl has not produced any evidence that, as a status Paramedic, he was deprived of any pay he would otherwise have received. Indeed, James Stauber, who is Gold Cross' Risk Manager, and who previously was in charge of Paramedic operations in the Duluth area, much as Johnson is today, testified that the principal disadvantage of nonstatus standing is the burden in scheduling that is imposed upon Gold Cross's management, as a nonstatus Paramedic can only be assigned to a schedule that allows him or her to be accompanied by a status Paramedic. Of course, we recognize Lisdahl's testimony that he was embarrassed, as a nonstatus Paramedic, to have his work performance reviewed by a status Paramedic who had less seniority than he did, but that testimony was without reference to any given evaluator-employee, and he did not testify to any observation by himself, or others, that only returning veterans were subjected to such nonstatus assignments.

Thanks,

Chad

*Id.*

On the following day, Johnson replied:

I'm not in a hurry, so I'll wait to hear from the three of you. We should get the observation reports to the FTOs for review prior to a 3 month peer review.

*Id.*

Lisdahl testified that, thereafter, he never asked to see Dr. Schrock until he was directed to do so. On February 28, 2007, Lisdahl met with Dr. Schrock, and following his successful examination by the Medical Director, Lisdahl was elevated to the position of a status Paramedic. Although Lisdahl testified that he thought he should have been seen by Dr. Schrock sooner, the competent and credible evidence, by a preponderance, proves that Lisdahl deferred his meeting with Dr. Schrock in January of 2007, and never requested to be examined by him but, rather, was directed to do so, apparently after Lisdahl completed the additional training he identified in his email of January 15, 2007. Accordingly, we find, again by a preponderance of the evidence, that Lisdahl received his status Paramedic designation as soon as he was qualified, both by his assessment, and by Dr. Schrock's, to hold that accreditation.

17. As to the Assistant Team Captain slot, the Record unequivocally demonstrates that Lisdahl shared an Assistant Team Captain position with Mathison, and that Mathison served as Lisdahl's field observer towards Lisdahl's qualification to be a status Paramedic. The reason for that placement, however, is in dispute. According to Johnson, he went to Mathison, who was then serving as the Assistant team Captain to Swor on the B Shift, and

informed him that there was a problem since Lisdahl had held that position before he went on Military Leave. Mathison's testimony confirmed that conversation with Johnson, and Mathison related that Johnson did not ask Mathison to step aside, and Mathison was told that he might share the Assistant Team Captain position with Lisdahl. Following his conversation with Mathison, Johnson spoke with Lisdahl about the same problem and, according to Johnson, Lisdahl stated that he would share the Assistant Team Captain position with Mathison, and that is what happened. We credit Johnson's recollection of the facts, as critical aspects of Johnson's conversation with Mathison were independently corroborated by Mathison. In addition, there is no evidence that Lisdahl ever complained to Mathison, Johnson, Swor, or anyone else at Gold Cross, about having to share the Assistant Team Captain position with Mathison.[10]

18. Similarly, we find no evidence to suggest, let alone support, Lisdahl's claim that Gold Cross compelled him to recertify with the National Registry as a discriminatory or retaliatory act. The evidence of Record is both abundant, and uncontroverted, that for as long as any witness could remember, Gold Cross has insisted on its Paramedics to be certified by the National Registry. Paul D. Anderson ("Anderson"), who is the Chief Operating Officer of Gold Cross, and who has been an employee of Gold Cross for just shy of thirty-five (35) years, testified, without contradiction, that the company has been insistent upon its Paramedics having a current certification by the National Registry for all of his time with the company. In Lisdahl's instance, Gold Cross recognized

---

10. According to Mathison, the sharing of that position was a nonissue, as Swor seldom took time off from work, which would cause one of the Assistant Team Captains to fill in for Swor. More importantly, however, Lisdahl

has failed to produce any evidence of any damage, owing to lost back pay, or anything else, that was incurred as a result of his having to share the Assistant Team Captain position with Mathison.

that his certification had lapsed, during the time that he was on Military Leave, and it allowed him a year to recertify, which proved to have been mooted by Lisdahl's decision to terminate his employment with Gold Cross well before the expiration of the one (1) year period.

19. We find, based upon a preponderance of the competent and credible evidence, that Gold Cross' requirement, that Paramedics in its employ be certified by the National Registry, is a legitimate exercise of management's discretion to require the highest level of professional training and competence from those personnel who are tasked with patient care. The distinction of having a Paramedic workforce, that was so certified, was a matter of great pride to both the Paramedics, and the management witnesses, who testified before this Court. We have found no evidence that Gold Cross' universal insistence on certification, which is applicable to all Paramedics in Gold Cross' employ, without regard to any particular protected status on the Paramedic's part, constitutes anti-veteran animus.[11]

20. Following Lisdahl's return from Military Leave, an opening in a Team Captain's position occurred, and Lisdahl alleges that Gold Cross did not honor his seniority when another employee—Mathison—applied for, and was promoted to, that position. However, the evidence is uncontradicted that Lisdahl never applied for the position, and that Mathison did, and the evidence is equally uncontroverted that Gold Cross always posted job vacancies, and did not solicit individual applicants. Lisdahl did not testify that he inquired of management whether he was qualified for the Team Captain position, although he expressed the view that he

did not think he was by virtue of his nonstatus standing.

21. We are mindful that Stauber testified that, to his recollection, no nonstatus Paramedic had ever been promoted to a Team Captain slot, but he left the operations side of Gold Cross, while Lisdahl was on Military Leave, and Stauber candidly admitted that he had not been aware of Lisdahl's circumstances, after Lisdahl returned from Military Leave, and was not directly knowledgeable about the fact that Lisdahl, and Mathison, shared an Assistant Team Captain slot. Swor also testified that, in his thirty (30) years with the company, no nonstatus Paramedic had ever been promoted to a Team Captain slot. However, the testimony was uncontroverted that, as Assistant Team Captains, the nonstatus Paramedic—here, Lisdahl—performed the same job duties as the status Paramedic—here, Mathison. Indeed, no one questioned Stauber, or Swor, as to how a nonstatus Paramedic could hold an Assistant Team Captain's assignment.

22. On the other hand, Anderson testified, we find credibly, that Lisdahl could have applied for the Team Captain's position, and he thought that Lisdahl would have been competitive for the slot. As related by Anderson, had he applied, Lisdahl would have been "on top of the list," and Anderson wished that Lisdahl would have applied. While Anderson was clear, that he would neither have encouraged, nor discouraged, Lisdahl to apply for that position for, with respect to all of Gold Cross' employees, you have to apply for a job vacancy to be considered for that vacancy. In fact, Anderson noted that, since Stauber left his position with the company

---

11. Once again, the Plaintiff has failed to demonstrate any adversity caused by Gold Cross' certification requirement. He has isolated no particular expense that he incurred as a result

of that requirement, or any lost work time or benefits owing to Gold Cross' requirement that its Paramedics be certified with the National Registry.

in operations, Gold Cross developed a system-wide application procedure to fill job vacancies.

23. In sum, notwithstanding Lisdahl's allegations to the contrary, we find, by a preponderance of the credible and competent testimony, that Lisdahl has failed to demonstrate that he suffered any material adverse employment action during the period following his return from Military Leave.

24. We further find that Lisdahl has failed to show that Gold Cross, or Johnson, harbored any anti-veteran animus that impacted upon any of their decisions with respect to Lisdahl. We expressly find that the concentrated effort by Lisdahl, and his attorney, to demonize Johnson was as fictionalized as it was scurrilous. To be sure, Johnson's management style engendered criticism. By his own testimony, Johnson conceded that he has been told that he can be abrasive, that his management style is direct, and that he does not "tell stories" at work, or otherwise "waste time." While he described himself as a "friendly person," he also acknowledged that he is "business first" at work. Johnson recounted that he had replaced Stauber, who had not enforced the company's rules strictly. According to Johnson, his superiors impressed upon him that Gold Cross has processes, and Gold Cross expected supervisors to enforce those processes. As a consequence, Johnson characterized himself as "direct," "strict," and as having "high standards." Johnson unequivocally admitted that he enforces the rules, and that management expects him to enforce the rules, which has caused "some resistance to his management style."

25. Johnson's self-description was shared by others. For example, Johnson's immediate supervisor, Bradley Hallum ("Hallum"), testified that he has "coached" Johnson the most on Johnson's interaction with his Team Members, and that he regarded Johnson as being "very cooperative" with him in following his coaching. Indeed, the Record discloses that, in 2005, Johnson completed a course entitled "Mutual Respect Update," and one entitled "Skills for Conducting Effective Meetings," see, *Plaintiff Exh. 6,* and, in 2006, he completed a course on "Quality Discussion." *Id.* Anderson described Johnson as being "opinionated," as being a person who felt strongly about his views, but he expressly denied that Johnson had a "hotheaded" management style. The first complaint that Anderson heard concerning Johnson related to an incident of "horseplay" in October of 2006.

26. As related by several witnesses,[12] in October of 2006, the Team Captains attended a retreat in North Branch, Minnesota, on October 16 and 17, 2006. After the business meeting, the Team Captains met in a banquet room, which had an adjoining swimming pool, for a social hour. Horseplay, apparently fueled by liquor and testosterone, ensued when a group of Team Captains decided to throw Johnson, who was their immediate supervisor, into the swimming pool. Johnson asked that he be allowed to remove his wallet and cell phone and, after being allowed to do so, he was half-thrown, and he half-jumped, into the swimming pool. Upon exiting the pool, a James Johnson ("J. Johnson") started to spin his towel with the intention of swatting at Johnson. According to Johnson, and there is no testimony to the

---

**12.** The incident in October of 2006, was a topic in the testimony of Johnson; Hallum; Anderson; Eric Klavetter ("Klavetter"), who investigated the incident; Thomas Fennell ("Fennell"), who also investigated the inci-dent; Swor; Lisdahl; and Johnson. We have considered, and weighed, their testimony in reaching the Findings we express on this incident.

contrary, J. Johnson is an imposing individual, as he stands about six (6) feet, five (5) inches tall. In order to avert being swatted, Johnson went low, and J. Johnson went high, causing J. Johnson to fall onto the pool decking, which caused a bruise and a welt. At that point, cooler heads intervened, and the altercation ended.

27. Almost four (4) months after that incident, in February of 2007, someone sent an anonymous Hotline Report to Klavetter, who is the Compliance Officer at the Mayo Clinic, and who holds a law degree, and a Masters in Administrative Studies, in which the incident was recounted, and an investigation was requested. See, *Plaintiff Exh. 8.* Klavetter forwarded the Hotline Report to Fennell, who is Klavetter's contact at Gold Cross, who handles Hotline Reports involving Gold Cross, and who advised that he had attended that training session, but had left before the incident occurred. *Id.* According to Fennell, even though he also attended the session on the day after the incident, no one spoke to him about the incident's occurrence. *Id.* Fennell then investigated the incident, spoke with both Johnson, and J. Johnson, and reported the results of his investigation to Klavetter. Fennell concluded that the incident was the product of horseplay, and he did not recommend any further action as to any of the participants. See, *Plaintiff Exhs. 9 and 10.*

28. Johnson testified that both he, and J. Johnson, apologized to each other for the incident, but he was embarrassed by his own conduct, reported the incident to Hallum, and recommended that he be subjected to corrective action. Hallum, however, was not persuaded that any corrective action was necessary, and no one received discipline arising out of the incident. While the incident was unfortunate, and resulted in an injury to J. Johnson, we find no connection between that incident, and Lisdahl's claims. Lisdahl ac-

knowledges that he was at the incident, and there is no suggestion, let alone evidence, that Johnson said or did anything to Lisdahl at that time. Indeed, this Record is bereft of any evidence that Johnson was ever physical with Lisdahl.

29. Several witnesses, who were employees of Gold Cross, testified to comments, that they attributed to Johnson, and that, assertedly, were not complimentary about those who served in the military. For example, Stauber testified that, in the early 1980's, Johnson expressed sarcasm, and derogatory comments, about Stauber's military service. According to Stauber, his service obligations resulted in his being scheduled, on military leave, on a lot of weekends, so Johnson became upset that he was being compelled to work an increased number of weekends. What the purported comments were, Stauber did not specify, and therefore, we are unable to assess whether they were either sarcastic, or derogatory.

30. Stauber also related that, in the mid 1990's—in 1994 or 1995—a part-time Paramedic was enlisting in the International Guard's School of Explosives, and would be absent from Gold Cross' workplace for ten (10) to (12) weeks. While that employee was on leave, another employee filled an open slot but, when the first employee returned from leave, Stauber had that employee bump the employee who had filled that slot. As the Union Steward for the bumped employee, Johnson complained, in conjunction with the Union's Business Agent, but Stauber supported the employee returning from Military Leave, and that was the decision upheld by the company. While Stauber felt that Johnson should not have questioned Stauber's decision, we interpret the disagreement as part and parcel of the routine dialectic between a union and management.

31. Stauber also recalled that Johnson had made remarks to the effect that some in the Army Reserves did not do anything except play cards, and that, with respect to one coworker, who was in the Army Guard, Johnson had expressed the opinion that, in view of that worker's weight and bearing, military service had to be a joke. The dates for those comments were not identified, but given the rarity of exchanges, between Johnson and Stauber, at any time relevant to Lisdahl's claims, those comments, to the extent they are true, or derogatory, are stale, at best.

32. Swor also testified to comments that he attributed to Johnson. Swor recalled that Johnson had told him that Swor was not in the Army but was in the Reserves in order to party. According to Swor, he let the comment go without objection. Swor also recalled that Johnson, at some undisclosed date, had stated, with respect to Stauber, who was then a Colonel in the Air Force, words to the effect that "there goes Jim in a monkey suit." Again, those recollections appear to relate to a somewhat distant time, given Stauber's retirement from military service well before Lisdahl went on Military Leave. While Swor thought that Johnson did not have a high regard for anyone at Gold Cross who was also in the military, we find that impression to be conclusory, and without specific substantiation as to anytime relevant to Lisdahl's claims.

33. Swor, and others, recalled Johnson stating, at one or more Captain's Meetings, that Gold Cross did not have to hire Lisdahl back, since Lisdahl had voluntarily left on Military Leave, but history proved that Johnson was wrong, and that Gold Cross had an obligation to rehire Lisdahl and, on this Record, honored that obligation. On another occasion, relevant to Lisdahl's claims, Lisdahl took issue with Johnson's criticism of Swor for exceeding the time allowed for the use of cellphones. According to Johnson, some of the employees, including Swor, were abusing the number of minutes allowed on the cellphones, with the result that the cellphone expense was exceeding that budgeted by Gold Cross' management. Lisdahl took issue with that complaint by Johnson, and words were exchanged, but nothing further resulted from that disagreement. Apparently, following that Team Captain's Meeting, Johnson asked Lisdahl if that was the way that Lisdahl would be reacting to Johnson in the future.

34. Lisdahl also elicited the testimony of Alan Johnson ("A. Johnson"), who had a verbal altercation with Johnson in about 1996 or 1997. At that time, and A. Johnson allowed that it could have been in front of others, A. Johnson accused Johnson of having an extramarital affair. Johnson lost his temper over that accusation, and told A. Johnson that, if he heard the comment again, he would rip A. Johnson's face off. At that point, according to Swor, Swor intervened, and nothing further occurred between the Johnson and A. Johnson.

35. We have considered all of these comments, and the others that randomly occurred in the Record, and find that they fail to establish any anti-military animus on either Johnson's part, or on the part of Gold Cross. While Gold Cross' management had not tabulated the number of its employees who had worked for the company while fulfilling their military service to our country, the testimony of the witnesses disclosed that the circumstance was not rare, and appeared to be fairly routine, and without incident. The comments attributable to Johnson were either severely dated, or they were oblique with reference to anything undesirable about military service, whether standing alone, or in conjunction with a career at Gold Cross. Notably, no one testified concern-

ing any criticism that Johnson voiced, as to Lisdahl, owing to Lisdahl's military service. Although one witness, Michael T. Amendola ("Amendola"), testified that he overheard Johnson say that Lisdahl had a "bad attitude," Amendola added that he never asked Johnson why he felt that way. Plainly, the comment is unrelated to any specific anti-military prejudice.[13]

36. Beyond finding no evidence to persuasively support Lisdahl's contention that either Gold Cross, or Johnson, were prejudiced against military veterans, inclusive of Lisdahl, we find no competent or credible evidence that Lisdahl was constructively discharged from his employment at Gold Cross. On May 21, 2007, Lisdahl requested time off, pursuant to the Family Medical Leave Act, see, *Title 29 U.S.C. §§ 2601, et seq.* ("FMLA"), owing to his self-reported "serious health condition" of "Post Traumatic Stress Disorder (PTSD) secondary to combat duty in Iraq." *Defendant Exh. 42,* at pp. 1–2. Gold Cross granted the request.

37. In August of 2007, Lisdahl filed a claim for Long Term Disability Benefits for a medical condition that Lisdahl identified as "PTSD–Combat Vet." *Defendant Exh. 44,* at p. 1. Lisdahl's claim was denied, in a letter dated September 10, 2007, as follows:

> The Summary Plan Description (SPD) states under the section addressing Disabilities Not Covered and Limitations and Exclusions on Plan Benefits: "Disabilities will not be covered by the Long Term Disability Plan if they are caused by or contributed by: Acts of War." According to your application, your disabling condition was caused by or contributed by an act of war. Therefore, your condition and disability are not covered under the Long Term Disability Plan and we must respectfully deny your claim for benefits. I have attached a copy of the relevant page of the SPD.

> \*       \*       \*

> If you disagree with the benefit determination of your claim, you may appeal that decision. Your 1st level appeal must be in writing and submitted to the Claims Administrator at the address below. You must state the reason you disagree with the decision of your claim and your appeal must be filed within 180 days after you received notice denying your claim. \* \* \*

*Id.*

Lisdahl took an appeal to the First Level.

38. In a letter dated May 22, 2008, Lisdahl's First Level Appeal was denied for the following reasons:

> We received your written request of a first level appeal on March 6, 2008. Along with your letter you provided a report from Dr. Richard Duus dated February 25, 2008. An Independent Medical Evaluation (IME) was completed on April 21, 2008 with Dr. John Rauenhorst, MD. Enclosed please find a copy of his initial report dated April 21,

---

**13.** We take judicial notice of the fact that both Swor, and Amendola, have commenced their own causes of action against Gold Cross, and Johnson, under the USERRA, that arise from their contention that Gold Cross, and Johnson, have discriminated against them because they support Lisdahl's USERRA claims. See, *Mike Amendola v. Mayo Foundation for Medical Education and Research d/b/a Mayo Medical Transport a/k/a Gold Cross Ambulance,* Civ. No. 08–6231 (JNE/RLE); *Roger Swor v.*

*Mayo Foundation for Medical Education and Research d/b/a Mayo Medical Transport a/k/a Gold Cross Ambulance,* Civ. No. 08–6232 (JNE/RLE). Neither Swor, nor Amendola, testified to the specific factual or legal bases for their USERRA claims, and therefore, we are afforded no basis to draw any inference, as to either Johnson's, or Gold Cross', actions with respect to Swor, or Amendola, that relates to any anti-veteran animus.

2008. Also enclosed please find the functional job description of your paramedic job at Gold Cross Ambulance Service, and the subsequent follow up report from Dr. John Rauenhorst dated May 13, 2008 after he reviewed the functional job description.

Your initial application for Long Term Disability (LTD) benefits was denied because the Post Traumatic Stress Disorder (PTSD) condition was due to your military service, which is specifically excluded from the Mayo LTD plan. The report from Dr. Richard Duus, dated February 25, 2008, states that there is little evidence that your military experience has an adverse impact on your work life and that the PTSD diagnosis might not be accurate. An IME with Dr. Rauenhorst provided an opinion that you are not disabled from performing the duties of your regular occupation. Based on the medical information received, we must respectfully maintain the denial of (LTD) benefits. The information we have on file does not support that you have met the definition of disability under the Mayo LTD plan. The Mayo LTD plan indicates that you must be completely unable to perform the duties of your regular occupation. Based on the medical information received to date, you are not disabled from performing the duties of your job.

If you disagree with the decision of your 1st level appeal, your 2nd level appeal must be in writing to the Plan Review Committee. You or your representative must state the reason you disagree with the denial of your appeal and must be filed within 60 days after you received the notice denying your 1st appeal.
\* \* \*

*Defendant Exh. 46,* at p. 1.

Lisdahl took no appeal to the Second Level and, upon the unopposed Motion of the Defendants, the Court dismissed his claim, under the Employee Retirement Income Security Act, see, *Title 29 U.S.C. §§ 1001, et seq.* ("ERISA"), with prejudice. See, *Order of August 28, 2009, Docket No. 134.*

39. In addition to his claims for benefits, under the FMLA, and Gold Cross' Long Term Disability Plan, Lisdahl also applied for disability benefits from the United States Department of Veterans Affairs ("VA"). In a sworn averment dated May 17, 2007, Lisdahl attested to the following:

> I have been seeking treatment for mental health issues at Twin Ports VA Outpatient Clinic in Superior, WI. I was diagnosed there with PTSD and a positive screen for a TBI [i.e., Traumatic Brain Injury]. I have been experiencing nightmares frequently regarding combat action in Iraq, along with anger outbursts, increased irritability, and daytime flashbacks of military service and fellow Marines killed around me during multiple tours in Iraq as an infantry Marine. I have difficulty sleeping at night and have been prescribed a medication for that from the VA. I am currently unable to perform my job duties at work and I'm on a disability leave for an unknown amount of time. It has been hard for me since release from active duty in Oct. 06 to deal with all of these problems. My wife believes I have changed since Iraq and that I am more callous now. It is difficult for me to have loving feelings, and I cannot tolerate large groups of people I don't know. I have enclosed my medical records from the T.P.O.P.C.VA in Superior, WI.

*Defendant Exh. 48,* at pp. 1–2.

In an attachment to that letter, Lisdahl advised that he had "no other information or evidence to give VA to substantiate my claim." *Id.* at p. 3.

40. In further support of his claim for VA disability benefits, Lisdahl submitted a statement dated August 10, 2007, in which he averred as follows:

I hereby wish to be evaluated for the service-connected disability of chronic depression and traumatic brain injury. I have been seen at the Twin Ports Veterans Outpatient Clinic in Superior, WI and have been screened already for TBI. I am scheduled to go down to the MPLS VA Hospital in January 2008 for a week for inpatient treatment in the Poly Trauma Unit. Regarding the chronic depression, I am currently on medication for this condition. I have been seen at the Twin Ports Veterans Outpatient Clinic in Superior, WI and have received a prescription for medication for this condition. Please obtain records online for my claim from Twin Ports in Superior, WL Please schedule me for an examination at your earliest conveninece [sic].

*Defendant Exh. 49.*

A further statement in support of his VA disability benefits claim followed on August 26, 2007, in which Lisdahl attested to the following:

This statement is in support of my claim for service connected chronic depression and traumatic brain injury. I am a three combat tour Marine infantry veteran, all tours served in Iraq, during my second tour my vehicle was hit directly by IEDs on two different occasions dazing me during both incidents. After these occurred I returned to the U.S. and noticed daily difficulty in concentration and memory. As I began treatment at the VA for other service connected conditions, I was screened and diagnosed with a traumatic brain injury which my health care providers believe is directly related to the IED strikes. I returned to my paramedic job after I completed my military service, and daily difficulty with concentration and memory greatly impacted my ability to remember the information I needed to know as a paramedic i.e. treatment algorithms, medication dosages, and protocols. I have been on a medical leave from this job at a reduced rate of pay since May of this year due [to] service related medical conditions at the direction of my VA health care provider. I will be attending inpatient treatment at the Minneapolis VAMC's Traumatic Brain Injury–Polytrauma center in January 2008 for a week.

I have also been diagnosed with chronic depression by Dr. Gary Fischler at the Minneapolis VA. I am currently taking two antidepressant medications prescribed by the VA (trazadone and citalopram). Chronic depression has greatly impacted my social and family life, as well as my employment. I no longer like to be around many family members and friends that I spent a lot of time with prior to my military service. I feel like I spend most of my time alone, and I dont [sic] feel like I can change that feeling. These conditions along with my other service connected disabilities have made it extremely difficult for me to search for a career due to my own limitations and opportunities in the area where I reside. I feel my only option is to hope someday I can have my own business working for the most part on my own, since I have difficulty being around and working with others. My employment status with my current job will be questionable in the near future, as my physicians have stated it would be detrimental for me to return to that environment. My wife has been supportive throughout my military service and after, but she too notices several changes with me since my return to civilian life. The effects on my social, family, and employment have not helped

with my depression and I can only hope that it doesnt [sic] worsen. If any further information is needed, please fee free to contact me.

*Defendant Exh. 50,* at pp. 1–2.

While we understand Lisdahl is receiving disability benefits from the VA, the amount of those benefits is not disclosed in this Record.

41. Subsequently, on June 3, 2008, Lisdahl filed a claim for increased compensation based upon unemployability. As his claim form explained:

This is a claim for compensation benefits based on unemployability. When you complete this form you are claiming total disability because of a service-connected disability(ies) which has/have prevented you from securing or following any substantially gainful occupation.

*Defendant Exh. 51,* at p. 1.

In support of his claim, Lisdahl averred as follows:

I have been off of work unpaid since May 2007, and unable to secure any other jobs due to service connected conditions.

*Id.,* at p. 2.

In further support of his unemployability claim, Lisdahl attested as follows:

I did receive the I.U. application sent July 24, 2007, but I was under the impression that applying for I.U. would affect my claim. I now know that impression was incorrect. I have been off of work as a Paramedic since May of 2007 by the direction of Mr. Wauman [sic] P.A. who I see at the VA Clinic in Superior, WI. My service connected PTSD along with my bad knees have prevented me from working and forced me to resign from my Paramedic job. I have applied for several other jobs in various fields over the past 13 months with no job offers. I have a daughter due to be born in 3 weeks and no gainful

employment to support her. I would have applied for this last year had I known it wouldn't have affected my claim. I am asking with great hopes of the VA approving I.U. for me due to the fact I havent [sic] been earning an income for well over a year now, and my service connected conditions severely restrict any new jobs I can apply for. If you have any questions please contact me @ 218–343–* * *, as I would like to expedite this as much as I can.

*Defendant Exh. 52.*

The parties have represented to the Court that Lisdahl's unemployability claim was denied by the VA.

42. Notably, each of the attestations to the VA, which Lisdahl tendered, and which we have quoted in the foregoing Findings, contain the following advisory:

I CERTIFY THAT the statements on this form are true and correct to the best of my knowledge and belief.

\*       \*       \*

PENALTY: The law provides severe penalties which include fine or imprisonment, or both, for the willful submission of any statement or evidence of a material fact, knowing it to be false.

*Defendant Exhs. 48, 49, 50, and 52.*

Lisdahl's application for unemployability benefits contained the following, differently-worded certification, and warning:

I CERTIFY THAT as a result of my service connected disabilities, I am unable to secure or follow any substantially gainful occupation and that the statements in this application are true and complete to the best of my knowledge and belief and understand that these statements will be considered in determining my eligibility for VA benefits

based on unemployability because of service connected disability.

\* \* \*

PENALTY: The law provides severe penalties which include fine or imprisonment or both for the willful submission of any statement or evidence of a material fact, knowing it to be false or for the fraudulent acceptance of any payment to which you are not entitled.

*Defendant Exh. 51.* at p. 2.

Notably, on cross examination, Lisdahl admitted that he recognized his statements, as contained on the VA forms, were the same as sworn testimony. While, at one point, Lisdahl suggested that Kristopher Wallman ("Wallman"), who is a Physician Assistant at the VA Clinic, in Superior, Wisconsin, completed the forms, he acknowledged that he would not simply accept others' statements if they were not true.

43. Equally notable, each of his sworn statements to the VA identified a singular basis for his claims of disability, and of unemployability—his service connected injuries of PTSD, traumatic brain injury, and the condition of his knees, which had required corrective surgery. Lisdahl's statements are bereft of any accusation, let alone evidence, that Lisdahl's decision to leave the employ of Gold Cross was the result, indirectly or directly, of any discriminatory, or other unlawful conduct, by either Gold Cross generally, or by Johnson in particular. If his contentions, under the

USERRA, were accurate and honest, it would have been logical for Lisdahl to have pursued his ERISA claim in earnest, given the fact that Gold Cross' denial of that claim was predicated, at the outset, on the fact that Lisdahl's asserted basis for a long term disability was his service-connected injuries. Such a denial could have been readily remedied, had Lisdahl intended to do so, by then disclosing his contention that Johnson, and not his prior military service, was the cause of his claimed disability, and unemployability. However, Lisdahl effectively abandoned his ERISA claim, while contemporaneously seeking disability, and unemployability benefits, from the VA.[14]

44. More problematic to the Court is Lisdahl's testimony, at Trial, as it related to his alleged service-connected injuries, and his USERRA claim that he was constructively discharged from his employment at Gold Cross. On direct examination, Lisdahl testified that, by May of 2007, he was scared that Johnson wanted to fire him, and that fear detracted from Lisdahl's going on a call. He stated that he saw the injuries sustained by J. Johnson and that, by May, Lisdahl had formed the opinion that Johnson could attack him, and that factored into Lisdahl's decision that he could not work at Gold Cross. According to Lisdahl, he believed that, if Johnson attacked him and he defended himself, that he would no longer have a job as no one would believe Lisdahl. As related by Lis-

14. In his original Complaint, which was filed on August 15, 2007, Lisdahl alleged that "Johnson took steps to force Lisdahl to quit his job with [Gold Cross] or be evaluated as unsuitable for continued employment," and "harassed Lisdahl in front of witnesses on April 23, 2007, and continued to push, annoy, make uncomfortable, and harass Lisdahl in an effort to force Lisdahl out of employment with the defendant business entity." *Complaint Docket No. 1,* at p. 7 ¶¶ 28 and 29. Plainly, contemporaneous with both his VA claims, and his USERRA claims before this Court, Lisdahl was asserting harassment claims which, he now contends, are solely attributable to Gold Cross and Johnson. Lisdahl's ERISA claim was not added until his Amended Complaint was filed on October 28, 2007, which also would be contemporaneous with his accusations of unemployability due solely to his service-connected disabilities. See, *Amended Complaint, Docket No. 3,* at p. 7 ¶ 32. We find his claims not only to be starkly contradictory, but also irreconcilable.

dahl, as he became more and more worried about losing his job, he was showing less interest in making ambulance calls. He testified that a Paramedic should concentrate on medical care and in performing his calls properly, but he could not think about getting people to the next higher level of care, and therefore, he took medical leave, as his "doctor" thought an explosion was imminent.

45. Lisdahl testified that, at the time he took medical leave, he had no other stresses that affected him at work, or on the job, than those that he now attributes to Johnson. He acknowledged that he had memories of war, and dreams, but asserted that those did not affect his job, as the sole thing bothering him in the workplace was Johnson. According to Lisdahl, after seeking treatment, he did not return to work because he had not been informed that anything had changed at Gold Cross. He stated that he wanted to return to work, and was open to do so if Johnson's treatment had changed, but he had not contacted Johnson, and Johnson had not contacted him. For two and one-half (2½) months, Lisdahl received pay from Gold Cross, but he was denied his claim for long term disability, which he did not appeal beyond the First Level. Since, in an investigation that Lisdahl had requested the United States Department of Labor to commence, Gold Cross had denied doing anything wrong, he decided to file his lawsuit.

46. On cross examination, Lisdahl was asked to explain his applications for VA benefits and, in that testimony, Lisdahl did not question the accuracy of any of his statements to the VA, he admitted that, in making those written statements he understood that he was swearing to tell the accuracy of the contents of those statements, and he acknowledged that he would not make a false statement just because someone else told him to do so.

47. Nonetheless, on redirect examination, Lisdahl testified that, on his application for FMLA leave, Wallman told him to report that he was diagnosed with PTSD and, not being a doctor, Lisdahl did just that. He further testified that, with respect to his application for VA disability benefits, he spoke to Wallman, and under Wallman's direction, he thought his application was for what he was told that he was entitled to receive. See, *Defendant Exh. 48*. In Lisdahl's words, he could not weigh the impact and significance of his thoughts on his job performance on a professional basis, so he followed the guidance of Wallman. According to Lisdahl, he is not an untruthful person, and a lot of his claims were denied—he could not tally the exact number—but he was awarded VA benefits for PTSD, and "other conditions."

48. Lisdahl also testified that he was directed by the VA to file his unemployability claim as well. According to Lisdahl, while he received VA benefits for his knee surgeries, and the scars they left, for ringing in his ears, and for recurring headaches, his claim for unemployability benefits was denied. Lisdahl testified that the disabilities, for which he had been awarded VA benefits, did not rise to a level where he could not work at Gold Cross, and he stated that he is not a complainer, and did not file this lawsuit in order to obtain something he was not entitled to receive.

49. As for his application for long term disability benefits from Gold Cross, Lisdahl acknowledged that his claim was initially denied because he was claiming his disability to be PTSD which, because it related to an "Act of War," was excluded under the policy. As related by Lisdahl, he then went to see Dr. Richard Duus for an evaluation, and Gold Cross' long term disability insurer sent him for an Independent Medical Evaluation by Dr. John Rauenhorst. Lisdahl then read, verbatim, the

following excerpt from Defendant Exhibit 46:

The report from Dr. Richard Duus, dated February 25, 2008, states that there is little evidence that your military experience has an adverse impact on your work life and that the PTSD diagnosis may not be accurate. An IME with Dr. Rauenhorst provided an opinion that you are not disabled from performing the duties of your regular occupation.

*Defendant Exh. 46.* at p. 1.

According to Lisdahl, after returning from military service, he has never been disabled from performing the duties of a Paramedic owing to service-connected injuries, and he does not consider himself to be a "wounded veteran."

50. On recross examination, however, Lisdahl acknowledged that he had applied for VA unemployability benefits, in which he was claiming an inability "to secure or follow any substantially gainful occupation" due to service connected disabilities, was submitted some four (4) months after he had received Dr. Duus' consultative report, and the evaluation of Dr. Rauenhorst, to the effect that there was little evidence that Lisdahl's military service adversely affected his "work life," and that he was not disabled from performing his duties as a Paramedic, respectively. See, *Defendant Exhs. 51 and 52.* Nonetheless, according to Lisdahl, the statements in his VA unemployability application were truthful, and yet, shortly thereafter, in his redirect examination, Lisdahl testified that he submitted the unemployability application on the VA's information, and not on the reports submitted from Drs. Duus, and Rauenhorst, and that he never provided those reports to the VA.

51. To the extent that Lisdahl is claiming that he was innocently duped, by Wallman, and other VA staffers, to submit false reports of disability and of unemployability to the VA, the Court expressly finds the claim to be unbelievable. While Wallman presumably had the expertise to diagnose PTSD, he could only do so on the basis of the symptoms reported by Lisdahl. Lisdahl's subjective complaints—that his "service connected PTSD along with [his] bad knees have prevented [him] from working and forced [him] to resign from [his] paramedic job," *Defendant Exh.* 52—were exclusively known only to Lisdahl himself Wallman, and the other VA staffers, could no more prove, or disprove, Lisdahl's subjective complaints, than they could prove, or disprove, that he was having a headache, or back pain. See, e.g., *In re Grand Jury Investigation,* 114 F.Supp.2d 1054 (D. Oregon 2000)(rejecting claim of physician-patient privilege that could otherwise defeat a Grand Jury's investigation of an alleged fraud against the VA arising from a charge that a veteran's claim of disabling PTSD was based upon knowingly false symptoms the veteran presented to his psychotherapist). Only Lisdahl could inform Wallman, and the other VA staffers, whether his claims of unemployability were fabricated, or truthful.

52. Given the entirety of the Record, the Court finds that Lisdahl is a less than reliable historian as, given their irreconcilably conflicting content, his sworn attestations appear to be critically dependent upon the financial gain that he is seeking to obtain. His current claim of unemployability, as alleged against Gold Cross, and Johnson, is indistinguishable from his former claim of unemployability against the VA, with the singular exception of its targeted cause and, in view of the great weight of the credible and competent evidence, his current claim is as meritless as his VA unemployability claim. This Finding is independently corroborated by the fact that Lisdahl did not report to anyone in the management of Gold Cross, the purportedly draconian treatment, by Johnson, which forced him, he now says, to quit

his job. We find wholly implausible the inference that Lisdahl asks us to draw; namely, that all of his supporters, and close coworkers at Gold Cross, allowed Johnson to so torture him, without the slightest comment to Gold Cross' management, that Lisdahl was being so horrendously abused, as would cause him to leave a job he reportedly loved. Indeed, Lisdahl's immediate supervisor—Swor—testified that he regarded Lisdahl as a son, and yet there is nothing in this Record to so much as intimate that Swor, or anyone else, complained to Gold Cross' management that Lisdahl was being grossly abused. We find it incredulous that those, who routinely tend to the injured, would not have quickly reported such conduct if, in fact, the abuse was real.

53. Also fully corroborative of our Finding, that Lisdahl's claimed constructive discharge is contrived, is the absence in this Record of any evidence that, even in his last months with Gold Cross, Lisdahl's job performance reflected any "daily difficulty with concentration and memory greatly impact[ing][his] ability to remember the information [he] needed to know as a paramedic i.e., treatment algorithms, medication dosages, and protocols." *Defendant Exh. 50*, at p. 1. The Record also does not reflect "anger outbursts, increased irritability, and daytime flashbacks of military service and fellow Marines killed around [him]," or any inability "to perform [his] job duties at work." *Defendant Exh. 48*, at p. 1. Apart from Lisdahl's own sworn attestations, there is nothing in this Record which would intimate, however slightly, that Lisdahl had difficulty in having "loving feelings," or could not "tolerate large groups of people." *Id.* at p. 2. Indeed, Lisdahl's last performance review, by a coworker, which Lisdahl introduced into the Record, and which is dated July 27, 2007, is glowing in its praise of Lisdahl's work performance, and his capacity to confidently lead others. See, *Plaintiff Exh. 51.*[15]

54. The Court finds, based upon an ample preponderance of the competent and credible evidence, that Lisdahl did not confront work conditions at Gold Cross which caused him to leave his employment as a Paramedic, but expressly finds that he voluntarily quit his employment at Gold Cross.

55. The attached Memorandum is expressly made a part of these Findings of Fact, insofar as the Memorandum contains factual findings.

---

**15.** Synopsized, Lisdahl's coworker reported as follows:

Since his return to Gold Cross I have enjoyed working with [Lisdahl]," as "[h]e is always moving forward professionally taking Gold Cross with him;" "Ready for and prepared to respond;" "is a competent paramedic always putting his patients first;" "I feel safe working with [Lisdahl]," as "I know that he is in charge of the scene allowing me to concentrate on the patient;" "Believe that he does the job expected of him," and "[a]ble to get the information communicated as needed;" "Above average in professionalism" and "[i]s the medic I feel new employees need to have contact with in order to know what professionalism is;" "Is very confident with himself, might be intimating [sic] to others is able to solve problems with great outcomes;" "Does portray [Gold Cross] in a positive light just being [Lisdahl]," but "I do not know of him doing much other then [sic] the Assistant Team Captain job;" "I have been very happy working with [Lisdahl] since his return from Iraq;" "[Lisdahl] has been off the schedule for several months and his leadership is missed on our crew," and "I hope that he returns soon."

*Plaintiff Exh. 51*, at pp. 2–3.

These observations, which Lisdahl has proffered to the Court, are inconsistent with any contention that Lisdahl was seriously disabled, to such an extent as to be unable to function as a competent Paramedic, or that he could not hold any other "substantially gainful occupation." See, *Defendant Exh. 51*, at p. 1.

### III. Conclusions of Law

1. The Court has jurisdiction over the subject matter of this action pursuant to Title 28 U.S.C. § 1331, and Title 38 U.S.C. § 4323(b)(3), and (c)(2). Personal jurisdiction over Gold Cross, and Johnson, is proper, and the venue of this Court is appropriate by virtue of Title 28 U.S.C. § 1391(b).

2. On this Record, the Court concludes, based upon the foregoing Findings of Fact, and a great preponderance of the evidence, that neither Gold Cross, nor Johnson, discriminated against Lisdahl on the basis of his veteran's status, nor did they otherwise violate Lisdahl's rights under the USERRA.

3. The Court further concludes that, given the foregoing Findings of Fact, Lisdahl voluntarily quit his employment with Gold Cross, and was not constructively discharged.

4. The attached Memorandum is expressly made a part of these Conclusions of Law, insofar as the Memorandum contains legal conclusions.

### IV. Order

That, given the foregoing Findings of Fact and Conclusions of Law, the Court directs that Judgment be entered in favor of Gold Cross, and Johnson, and that Lisdahl's Amended Complaint is DISMISSED with prejudice.

### MEMORANDUM

During the course of his opening statement, Lisdahl's attorney voiced the truism that some cases have to be tried. It is equally true, however, that some cases should not have been filed in the first instance and, given our Findings and Conclusions, this lawsuit is plainly one of those. Predicated upon a hodgepodge of hyperbole, revisionism, and outright fiction, Lisdahl's claims, under the USERRA, are unsupported by either the facts or the law but, given his starkly contradictory attestations, the case required a Trial as Lisdahl's claims were not properly vetted prior to the lawsuit's commencement. In order to further explain, and supplement, our Findings and Conclusions, we offer this Memorandum. We begin with the Standard of Review that we have applied, and then proceed to explain our analysis.

■ A. *Standard of Review.* "[USERRA] was enacted in an attempt to prevent employment discrimination based upon military service." [16] *Clegg v. Arkansas Dep't of Correction,* 496 F.3d 922, 930 (8th Cir.2007), citing *Maxfield v. Cintas Corp.,* 427 F.3d 544, 551 (8th Cir.2005) ("*Maxfield I*"). "An employer violates USERRA when a person's membership in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership or obligation for service." *Maxfield v. Cintas Corp.,* 563 F.3d 691, 694 (8th Cir.2009), quoting *Maxfield I,* supra at 551. "The employee must initially show his military status was a motivating or substantial factor in an adverse employment decision, but an employer can defeat the claim by proving 'by a preponderance of evidence, that the action would have been taken despite the protected status.'" *Id.,* quoting *Maxfield I,* supra at 551. Here, Lisdahl alleges violations of Sections 4312, 4313, and 4311, of USERRA.

---

**16.** Since it is not germane to the issues we resolve, we follow the parties' lead and do not address whether Johnson, in his individual capacity, is an "employer" under USERRA, so as to be exposed to personal liability under that statute. See, e.g., *Staub v. Proctor Hospital,* 560 F.3d 647 (7th Cir.2009); *Risner v. Ohio Dep't of Rehabilitation and Correction,* 577 F.Supp.2d 953 (N.D.Ohio 2008); *Brandsasse v. City of Suffolk, Virginia,* 72 F.Supp.2d 608 (E.D.Va.1999); *Jones v. Wolf Camera, Inc.,* 1997 WL 22678 (N.D.Tex., January 10, 1997); *Novak v. Mackintosh,* 919 F.Supp. 870 (D.S.D.1996).

"Section 4312 [of USERRA] protects service members at the instant of seeking reemployment, entitling the service member to reemployment in either the position [he] would have been in had [he] not left for military service 'or a position of like seniority, status and pay, the duties of which the person is qualified to perform.'" *Clegg v. Arkansas Dep't of Correction*, supra at 930, quoting *Title 38 U.S.C. § 4313(a)(2)(A)* as "defining rights set forth in § 4312, which entitles a person to be rehired upon return from military service." "Section 4311 applies after reemployment has occurred and 'prohibits discrimination with respect to any benefit of employment against persons who serve in the armed services after they return from a deployment and are reemployed.'" *Id.*, quoting *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir.2006), as "noting that § 4312 protects military members up to the instant of reemployment while other sections of USERRA, such as § 4311 and § 4316, protect the member after reemployment occurs."

"While claims under USERRA do not follow the same three-step burden of shifting analysis set forth in McDonnell Douglas,[17] the employee must still have suffered an adverse employment action in order to succeed on a claim, *Maxfield (I)*, 427 F.3d at 551, defined in USERRA as a 'benefit of employment,' 38 U.S.C. § 4303(2)." *Id.* at 931. As our Court of Appeals explained, in *Clegg:*

> A benefit of employment is defined as "any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary * * *)." 38 U.S.C. § 4303(2). This "includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment." *Id.* Because USERRA was enacted to protect the rights of military service members and veterans it is construed broadly and "in favor of its military beneficiaries."

*Id.* at 930–31, quoting *Maxfield I*, supra at 551–52 (internal marks omitted).

As the Court concluded, in *Clegg*, "the cases where it has been held that a change in job duties constituted an adverse action involved instances when the new job responsibilities were drastically different than the old." *Id.* at 931, citing *Francis v. Booz, Allen & Hamilton, Inc.*, at 306 n. 4 (collecting cases).

■ As noted, "'[u]nlike the McDonnell Douglas framework (utilized in Title VII claims), the procedural framework and evidentiary burdens set out in section 4311 shift the burden of persuasion, as well as production, to the employer.'" *Maxfield I*, supra at 551, quoting *Gagnon v. Sprint Corp.*, 284 F.3d 839, 854 (8th Cir.2002), abrogated on other grounds, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). "Under USERRA, an employee must make "'an initial showing * * * that military status was

---

**17.** Gold Cross has mistakenly argued that "[d]iscrimination claims asserted pursuant to USERRA 'are analyzed under the burden shifting framework set forth in McDonnel [sic] Douglas.'" *Gold Cross' Post–Trial Memorandum, Docket No. 140*, at p. 17 of 34, quoting *Clegg v. Arkansas Dep't of Correction*, 496 F.3d 922, 926 (8th Cir.2007). Gold Cross simply misread *Clegg*. The quote from that decision, which was cited by Gold Cross, referenced discrimination claims pursuant to Title 42 U.S.C. § 1983, Title VII, and the Arkansas Civil Rights Act. See, *Clegg v. Arkansas Dep't of Correction*, supra at 926. Later, in that same decision, the Court expressly acknowledged that "claims under USERRA do not follow the same three-step burden shifting analysis set forth in McDonnell Douglas * * *." *Id.* at 930. We apply Eighth Circuit law.

at least a motivating factor or substantial factor in the [employer's] action.' " " *Id.*, quoting *Gagnon v. Sprint Corp.*, supra at 854, quoting, in turn, *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed.Cir.2001). "If the employee makes such a showing, " 'the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.' " " *Id.*, citing *Gagnon v. Sprint Corp.*, supra at 854, quoting, in turn, *Sheehan v. Dep't of Navy*, supra at 1014.

▆▆▆ "In determining whether the employee has proven that his protected status was part of the motivation for the [employer's] conduct, all record evidence may be considered, including [its] explanation for the action taken." *Id.* at 552, quoting *Sheehan v. Dep't of Navy*, supra at 1014. "For example, 'discriminatory motivation under the USERRA may reasonably be inferred from * * * proximity in time between the employee's military activity and the adverse employment action [and] inconsistencies between the proffered reason and the other actions of the employer."

*Id.*, quoting *Sheehan v. Dep't of Navy*, supra at 1014.[18]

B. *Legal Analysis.* As we have detailed in our Findings, Lisdahl has failed to present a *prima facie* case under the USERRA, on at least two (2) levels. First, he has failed to demonstrate that he was subjected to any adverse employment action, by either Gold Cross, or Johnson, and second, he has failed to demonstrate that any particular action by Johnson, or Gold Cross, as to which he claims discrimination, was motivated by anti-veteran animus, or that such animus was a substantial factor in prompting the action that was taken.

▆▆▆ Under Sections 4312, and 4313, Lisdahl alleges that he was not promptly returned to employment, upon his discharge from military service, and that Gold Cross failed to return him to the same position he had held before he left on Military Leave. "Section 4313 provides that a person eligible for reemployment under USERRA 'shall be promptly reemployed * * * in the position of employ-

---

**18.** During the course of his opening statement, counsel for Lisdahl expressed his opinion that the case law, in this Circuit, is "fairly scant" insofar as it relates to USERRA. Indeed, he felt there was no controlling body of law to be followed in this Circuit, and he encouraged the Court to look to the Sixth Circuit's decision, in *Petty v. Metropolitan Gov't of Nashville–Davidson County*, 538 F.3d 431 (6th Cir.2008), cert. denied, —— U.S. ——, 129 S.Ct. 1933, 173 L.Ed.2d 1057 (2009), for issues involving USERRA, and to *Wallace v. City of San Diego*, 479 F.3d 616 (9th Cir.2007), as to questions relating to constructive discharges. As our recitation of the Standard of Review we apply discloses, we find nothing undeveloped in the state of Eighth Circuit precedent either as to USERRA, or concerning constructive discharges, and our decision is governed by the law of this Circuit. To the extent that Lisdahl has so heavily relied upon *Petty*, we find the reliance misplaced, given the fact that, there, the returning veteran's employer refused to pay him

any salary or benefits until the veteran qualified, at least in the employer's view, to assume his prior employment, and additionally, the employer did not return that veteran to his original position as a patrol sergeant, or to any substantially similar position—circumstances that our Findings plainly show do not apply here. See, *Petty v. Metropolitan Gov't of Nashville–Davidson County*, supra at 436. In *Wallace*, after a Jury returned a Verdict for the veteran, and found that he had been constructively discharged, the Trial Court granted Judgment as a matter of law in favor of the employer. The Court of Appeals reversed, as the Court found that the veteran had offered evidence of a pattern of discrimination, and retaliation, by the veteran's employer, that was based upon the veteran's military status—evidence upon which a Jury could reasonably return a Verdict in the veteran's favor. Here, we have found no such competent and credible evidence of discrimination, or retaliation, by Gold Cross, or Johnson, against Lisdahl.

ment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform.'" *Reynolds v. RehabCare Group East, Inc.*, 590 F.Supp.2d 1107, 1112 (S.D.Iowa 2008), aff'd, 591 F.3d 1030 (8th Cir.2010), quoting *Title 38 U.S.C. § 4313(a)(2)(A)*. As we found, however, Lisdahl returned to work consistent with his agreement with Oelkers, in order to accommodate his own interests in moving into a newly purchased residence, and returning to the area. Lisdahl cites to no case in which, having agreed to a return to work date, the returning veteran can, months after the fact, change his mind and sue his employer under USERRA, for having acceded to the veteran's agreement. In fact, the only case we have found is to the contrary. See, e.g., *Vander Wal v. Sykes Enterprises, Incorporated*, 377 F.Supp.2d 738, 746 (D.N.D.2005)(where veteran informed employer that he was not available to return to work until May 4, and was returned to work on May 4, there was no violation of USERRA when, on the preceding April 23, the veteran's attorney wrote a letter to the employer demanding the veteran's "immediate reemployment"). Under the circumstances shown here, Lisdahl was promptly returned to work consistent with his agreement.

Nor has Lisdahl demonstrated that he was not returned to the same position he previously held. He had the same seniori-ty, and the same pay, although, as we have found, he agreed to share his previous position, as an Assistant Team Captain, with Mathison. The evidence shows no significant change in job duties, and his responsibilities, as an Assistant Team Captain, were "not drastically different" than from the period before his Military Leave. See, *Clegg v. Arkansas Dep't of Correction*, supra at 931. Indeed, Lisdahl has failed to prove any specific loss in pay, or employment benefits, that was occasioned by his sharing of the Assistant Team Captain slot with Mathison.[19] Of course, we understand Lisdahl to argue that, subjectively, he felt demeaned by returning as a nonstatus Paramedic, and therefore, his "status" had changed upon his return. If, as Lisdahl now claims, his nonstatus level was regarded by him as demeaning, we fail to understand why he did not make that known to his supervisors, and why he agreed to postpone his evaluation by Dr. Schrock until he had gained additional instruction and training. No one could have assessed Lisdahl's qualifications, and confidence as a status Paramedic, with more intimate knowledge of his abilities than Lisdahl, and he expressed the view that he was not adequately prepared to qualify until further work had been completed by him. Given this Record, we find no violation of USERRA under Sections 4312 and 4313.[20]

Nor do we find any violation of USERRA under Section 4311. To be sure, Gold Cross required Lisdahl to recertify with the National Registry because his certifi-

---

**19.** The very same may be said about Gold Cross' delay in paying Lisdahl for his prework screening expenses, and pay. If Lisdahl was out-of-pocket owing to that delay, he has failed to prove those damages in this case.

**20.** While Lisdahl may believe that he should have been promoted to the Team Captain position, rather than Mathison, the unvarnished truth is that Lisdahl did not apply for that position. We are aware of no decision, under the USERRA, that requires the employer to pursue a veteran, who has returned to work, so as to pressure that veteran to seek a promotion that is not automatic based upon the veteran's seniority. Lisdahl has presented no evidence that any other employee was asked, by Gold Cross' management, to apply for the Team Captain's opening, including Mathison.

cation had lapsed during the period of his military leave.[21] According to the credible and competent evidence, Lisdahl had been forewarned about the difficulty in maintaining that certification, owing to his absence on military leave, and he forwarded papers that were substantially incomplete, and would not have resulted in a renewal of his certification. Plainly, Lisdahl felt that certification by the National Registry was unnecessary, and merely a corporate garnishing demanded by Gold Cross' management. Notably, his view was not shared by any other witness, nor by Dr. Schrock, under whose medical license the Paramedics are allowed to tend to the medical needs of the public. Every witness, who testified on the subject, expressed pride that their fellow Paramedics had been trained to the exacting standards of an independent evaluator, and had professional qualifications in excess of those required by the State of Minnesota, and by many other ambulance services.

Here, Gold Cross did not deny Lisdahl any employment benefit on account of his failure to maintain his National Registry certification. Indeed, we are presented with no showing that he incurred any reimbursable expense, or did anything other than, perhaps, telephone the National Registry to determine when he could take his recertification test. He was not docked any pay, or benefits, was not denied any promotion for which he had applied, or any other employee benefit. He was afforded a year to recertify, and there is no evidence, in this Record, as to whether he would have failed to recertify, if he had taken the National Registry's test. More importantly, to the extent that Lisdahl contends that he was singled out to recertify, he has not demonstrated that any other Paramedic with Gold Cross—veteran or non-veteran—was exempted from the National Registry certification requirement. In fact, the testimony is to the contrary. Anderson, who held the longest seniority of anyone called to testify, advised that all Paramedics, at Gold Cross, were required to certify, and maintain their certification, with the National Registry. The Record also establishes, that when new hires are employed, who were

---

21. In practical effect, Lisdahl, and his attorney, interpret USERRA as a veterans' preference statute, such that Lisdahl should be excused from the same employment obligations, as are required of every other Gold Cross employee, including certification by the National Registry. In so contending, they have seriously misread USERRA. As the Supreme Court explained, in construing an earlier version of USERRA, "the legislative history * * * strongly suggests that Congress did not intend employers to provide special benefits to employee—reservists not generally made available to other employees." *Monroe v. Standard Oil Co.,* 452 U.S. 549, 561 and n. 12, 101 S.Ct. 2510, 69 L.Ed.2d 226 (1981). In continuing, the Court noted that a sponsor of the Act, in all of his three (3) congressional appearances, "made it abundantly clear that the purpose of the legislation was to protect employee reservists from discharge, denial of promotional opportunities, or other comparable **adverse** treatment solely by reason of their military obligations; there was never any sug-

gestion of employer responsibility to provide preferential treatment." *Id.* at 562, 101 S.Ct. 2510 [emphasis in original].

Lisdahl presents no legal authority to the contrary, and our independent search verifies that the same non-preferential intent has been attributed to USERRA by other Courts. See, e.g., *Crews v. City of Mt. Vernon,* 567 F.3d 860, 865 (7th Cir.2009); *Sandoval v. City of Chicago,* 560 F.3d 703, 705 (7th Cir.2009), cert. denied, —— U.S. ——, 130 S.Ct. 196, 175 L.Ed.2d 126 (2009)("A requirement of equal treatment is incompatible with a demand for preferential treatment."), citing *Tully v. Dep't of Justice,* 481 F.3d 1367, 1369–70 (Fed.Cir. 2007); *Gross v. PPG Industries, Inc.,* 2010 WL 313601 at *3–4 (E.D.Wis., January 20, 2010). We find no authority to provide Lisdahl a free pass from honoring his employment obligations—inclusive of certification by the National Registry—when the same obligations are equally applicable to veterans and nonveterans alike.

Paramedics with a different company, which did not have the certification requirement, Gold Cross insisted on their being properly certified with the National Registry. As a consequence, even if we concluded that the National Registry requirement was an adverse employment action as to Lisdahl, we are compelled by the uncontradicted evidence, to also conclude that the requirement owes its existence to Gold Cross' insistence upon excellence in its Paramedics, and is not motivated, in whole or in part, by anti-veteran animus.

█ Lastly, we turn to the main thrust of Lisdahl's claims against Gold Cross, and Johnson, and the only claim as to which Lisdahl has presented some evidence of damages; namely, that Johnson's inhumane conduct toward him caused Lisdahl's constructive discharge. A constructive discharge claim is actionable under USERRA. See, *Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082, 1085–86 (8th Cir.1998).[22] As the Court explained in *Knowles:*

> A constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable with the intent of forcing the employee to leave the employment. See *Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1420 (8th Cir.1995). A plaintiff can satisfy the intent requirement by demonstrating that his resignation was a reasonably foreseeable consequence of the employer's actions. See *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 732 (8th Cir.1996). Moreover, the intolerability of the working conditions is judged by

employing an objective standard; conditions are considered intolerable "if a reasonable employee would find them as such." *Bradford*, 54 F.3d at 1420.

*Id.* at 1086.

█ "An employee must, however, grant [his] employer a reasonable opportunity to correct the intolerable condition before [he] terminates [his] employment." *Anda v. Wickes Furniture Company, Inc.*, 517 F.3d 526, 534 (8th Cir.2008), quoting *Turner v. Honeywell Fed. Mfg. & Techs., LLC*, 336 F.3d 716, 724 (8th Cir.2003)[brackets in original].

In *Knowles*, our Court of Appeals explained the obligation of an employee, who is claiming a constructive discharge, to have acted reasonably in notifying his employer of the need for corrective action, as follows:

> As we have repeatedly held, an employee's duty to act in a reasonable manner includes "an obligation not to assume the worst and not to jump to conclusions too quickly." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996); see also, *Gartman v. Gencorp, Inc.*, 120 F.3d 127, 130 (8th Cir.1997). Thus, "[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged." *Tidwell*, 93 F.3d at 494; see also *Hanenburg v. Principal Mut. Life Ins. Co.*, 118 F.3d 570, 575 (8th Cir.1997); *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir.1997); *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir.1995).

**22.** Although *Knowles v. Citicorp Mortgage, Inc.*, 142 F.3d 1082 (8th Cir.1998), was decided under the Veteran's Reemployment Rights Act, *Title 38 U.S.C. § 2021, et seq.* ("VRRA"), enactment repealed, and provisions now contained in Title 38 U.S.C. §§ 4301–4307, "Congress intended for case law developed under the VRRA to aid in interpreting the USERRA." *Haight v. Katch, L.L.C.*, 2005 WL

1221205 at \*6 n. 7 (D.Neb., May 20, 2005); see also, *20 C.F.R. § 1002.2* ("In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA * * * and that the large body of case law that had developed under [earlier] statutes remained in full force and effect, to the extent it is consistent with USERRA.").

*Knowles v. Citicorp Mortgage, Inc.*, supra at 1086.

Here, the Record is uncontroverted that Lisdahl failed to report, to any member of Gold Cross' management, that he regarded Johnson's treatment of him to be objectively abusive. Rather, when Lisdahl left Gold Cross, in May of 2007, he did so by way of a medical leave which was predicated, by his own admission, solely upon the service-connected condition of PTSD. See, *Defendant Exh. 42*, at p. 2 ("Post Traumatic Stress Disorder (PTSD) secondary to combat duty in Iraq"). Accordingly, under the governing law of this Circuit, Lisdahl's constructive discharge claim is precluded by his failure to provide Gold Cross with a reasonable opportunity to correct the circumstances that, Lisdahl now claims, forced him to quit his employment with Gold Cross. See, *Williams v. City of Kansas City, Mo.*, 223 F.3d 749, 754 (8th Cir. 2000)(Since the plaintiff "made no attempt to inform her supervisors that she felt [a supervisor] was acting inappropriately," but "abruptly quit," "[i]t is difficult to find a[sic] employee's resignation objectively reasonable and subject an employer to liability for constructive discharge when the employee quits without giving her employer a chance to fix the problem."), citing *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir.1998).

█ Even if we did not grant a dismissal of Lisdahl's constructive discharge on that preclusive basis, we would further be obligated, given the Record before us, to find and conclude that Lisdahl's complaints about Johnson's conduct did not reflect actions that were so severe as to cause a reasonable employee to quit his or her job with Gold Cross. The Courts have realistically recognized that, ordinarily, the workplace does not have the cultured air of a debutante's High Tea, but is unavoidably impacted by the interaction of human chemistries which frequently foster hurt feelings, insensitivity, and outright rudeness. As a result, in order to be sustained, claims of inordinate abrasiveness in the workplace, assertedly committed by a supervisor against a subordinate, must successfully surmount the imposing hurdle of the materially adverse test. The materially adverse test "is objective such that we must determine whether any of the actions challenged here 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Recio v. Creighton University*, 521 F.3d 934, 940 (8th Cir.2008), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). "Therefore, we must 'separate significant from trivial harms' in order to determine whether [Lisdahl] [has] satisfied this prong." *Weger v. City of Ladue*, 500 F.3d 710, 726 (8th Cir.2007), quoting *Burlington N. & Santa Fe Ry. Co. v. White*, supra at 68, 126 S.Ct. 2405.

█ "Materially adverse actions include termination, demotion accompanied by a decrease in pay, or a material loss of benefits or responsibilities, but do not include 'everything that makes an employee unhappy.' " *Crews v. City of Mt. Vernon*, supra at 869, quoting *Lapka v. Chertoff*, 517 F.3d 974, 986 (7th Cir.2008); see also, *La Croix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 691 (8th Cir.2001)("Not everything that makes an employee unhappy is an actionable employment action;"."[r]ather, an adverse employment action is exhibited by a material employment disadvantage, such as a change in salary, benefits, or responsibilities."), citing *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1245 (8th Cir.1998), and *Williams v. City of Kansas City, Mo.*, supra at 753, citing *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 969 (8th Cir.1999). As a consequence, "[p]etty slights and minor annoyances in the workplace, as well as personality con-

flicts and snubs by co-workers, are not actionable." *Sutherland v. Missouri Dep't of Corrections*, 580 F.3d 748, 752 (8th Cir. 2009). Although many of the cited cases involve alleged Title VII violations, or violations of other Federal statutes that prohibit retaliation, "[t]here is no reason to understand 'adverse employment action' differently in the USERRA context." *Crews v. City of Mt. Vernon*, supra at 869.

Here, Lisdahl has presented evidence of a verbal confrontation, that he had with Johnson, at a Team Captains Meeting, which involved differences of opinion as to the Paramedics use of cellphones and, particularly, of Swor's reputed abuse of that privilege. While tempers were vented, and loud voices were exchanged on both sides, there is no evidence of a physical skirmish, nor any evidence that expletives were employed by either Johnson or Lisdahl. Lisdahl testified that immediately following that meeting, Johnson asked him, apparently in the presence of Swor, whether that was the approach that Lisdahl intended to take in his relationship with Johnson. Beyond that one exchange, there are only conclusory assertions that Johnson treated Lisdahl in either a dismissive way, or that he largely ignored Lisdahl. As best we can tell, the only occasions, when there would be contact between Lisdahl, and Johnson, were during the bimonthly Team Captains Meetings. Assuming, as we must for there is no evidence on the matter, that all of the Team Captains Meetings were conducted, and that Johnson and Lisdahl attended each meeting, then, over the course of the nine (9) months that Lisdahl worked at Gold Cross, he would have had an opportunity to have personal interaction with Johnson on only eighteen (18) occasions.

More importantly, there is no evidence that Johnson, and Lisdahl, had private meetings, at which Lisdahl's coworkers were not present. If, as Lisdahl portends,

he was physically fearful of being injured by Johnson, there is absolutely no credible basis to ascribe any legitimacy to that claimed fear. The unadorned truth is that, whatever may have been Johnson's treatment of Lisdahl at the Team Captains Meetings, no one in attendance, including Lisdahl, reported to management that Johnson was being unacceptably harsh to Lisdahl, much less that Johnson posed any real physical threat to Lisdahl's welfare. We reject, as being entirely incredible, that all the Team Captains, and Assistant Team Captains, were so intimidated by Johnson that they abdicated their own responsibilities to report unacceptable, or unlawful conduct, to Gold Cross' management, if they had witnessed it, or if it had been reported to them. The persons testifying before this Court were not gradeschoolers, who would be paralyzed by the intimidations of a playground bully but, rather, were responsible, experienced, and professional adults, who are entrusted with a near sacred trust in treating those who are most in need of care. We find wholly implausible that Lisdahl's coworkers, and supervisors, would have abjectly turned their backs on him if, indeed, Johnson's conduct toward Lisdahl was intolerably abusive.

On this Record, there is no credible evidence that, following his return from Military Leave, Lisdahl was ever formally disciplined, verbally warned, docked any pay or benefits, or was otherwise deprived of any employment advantage that he was entitled to receive owing to his seniority. While Lisdahl claims he was deprived of the opportunity to serve as the sole Assistant Team Captain, as he shared that responsibility with Mathison, we have found, based upon a preponderance of the competent and credible evidence, that Lisdahl agreed to that circumstance, and never so much as suggested to his coworkers, Mathison, or anyone else at Gold Cross, that

he objected to that arrangement. In sum, Lisdahl has flatly failed to show, by competent and credible evidence, that he suffered any materially adverse action following his return from Military Leave.

The cases in this Circuit have rejected, as being actionable, conduct which was far more abrasive than Lisdahl has shown on this Record. See, e.g., *Recio v. Creighton University*, supra at 940–41 (rejecting ostracism, and the "silent treatment" as not being materially adverse); *Weger v. City of Ladue*, supra at 727–28 (same); *Clegg v. Arkansas Dep't of Correction*, supra at 929–30 (rejecting a laundry list of conduct that the employee regarded as demeaning); *Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 786–87 (8th Cir. 2007)(same); *Bradley v. Widnall*, 232 F.3d 626, 631–32 (8th Cir.2000)(finding employer's conduct was not so severe or pervasive as to have been materially adverse, where employee claimed that she had been left out of the decisionmaking process, had been treated with disrespect, had been subjected to false complaints, and had her supervisory duties curtailed); *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159–60 (8th Cir.1999) (rejecting claim that being yelled at, and being subjected to unfair criticism, were materially adverse actions, and explaining that, while the "working atmosphere was not ideal," "a feeling of being unfairly criticized or [having to endure] difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."), quoting *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir.1994).

In our considered view, Lisdahl's complaints of abusive conduct by Johnson rise to no more than the "petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington N. & Santa Fe Ry. Co. v. White*, supra at 68, 126 S.Ct. 2405; see also, *Recio v. Creighton University*, supra

at 941 ("[Employees] may have * * * to withstand colleagues that do not like them, are rude, and may be generally disagreeable people," but "[a] court's obligation is not to mandate that certain individuals work on their interpersonal skills and cease engaging in inter-departmental personality conflicts."), quoting *Somoza v. University of Denver*, 513 F.3d 1206, 1218 (10th Cir.2008). Paraphrasing the Court, in *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1058 (8th Cir.2007), quoting *Breeding v. Arthur J. Gallagher & Co.*, supra at 1160, "[t]he evidence shows only that [Lisdahl] felt unfairly criticized and that his work conditions, particularly his encounters with [Johnson], were unpleasant to him," but "[s]uch conditions are not so intolerable as to compel a reasonable person to resign." "While we recognize that situations may exist where filing a complaint with a superior officer would be perceived by a reasonable person as a futile act, [Lisdahl] has presented no such evidence," *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir.2002), and we find and conclude that, for reasons personal to him, Lisdahl simply chose to voluntarily resign from his employment at Gold Cross.

Recognizing that the sum of the complaints can be larger than their individual components, we have considered the collective impact of the alleged abusive conduct that we have found credible, and we are convinced that, in total, the complained of conduct would not cause a reasonable employee to leave his employment. Accordingly, we find and conclude that Lisdahl has failed to prove that he was the victim of a constructive discharge. Whatever may have been Lisdahl's real reason for leaving the employ of Gold Cross, it was not caused, directly or indirectly, in whole or in part, by any action or inaction on Johnson's part, or on the part of any other employee of Gold Cross. See, e.g., *Trnka v. Biotel, Inc.*, 2008 WL 108995 at *6

(D.Minn., January 9, 2008), citing *Carmellino v. District 20 of N.Y.C. Dep't of Educ.*, 2006 WL 2583019 at *25 (S.D.N.Y., September 6, 2006)("testimony that supervisor was 'not being nice' to plaintiff, including lack of eye contact, verbal abuse, dirty looks, and 'lack of niceties' insufficient to support inference of discrimination; such assertions 'may give rise to a reasonable inference that [the supervisor] was gruff, neglectful, or perhaps even rude in her interactions with [the plaintiff], [but] they do not support a finding that [the plaintiff's] alleged constructive discharge resulted from discriminatory animus.' ").[23]

We close with a fuller explication of our reasons for excluding the proffered expert testimony of Dr. Duus. In our Pretrial Order of April 4, 2008, we directed that Lisdahl disclose his expert opinion evidence "on or before July 30, 2008." See, *Docket No. 34*, at p. 3 of 4. When the case was still assigned to a District Court Judge, Gold Cross filed its Motions *in limine* on May 22, 2009, advising that Lisdahl did not disclose Dr. Duus as an expert witness until May 11, 2009, and that, as of the date of those Motions, Lisdahl "ha[d] not disclosed any specifics regarding the testimony of Dr. Duss [sic]." *Docket No. 104*, at p. 6 of 8. In a response to those Motions, which is dated June 16, 2009,

Lisdahl did not deny the lateness of his identification of Dr. Duus, but stated as follows:

> Whether Dr. Duus will be offered as an expert witness at trial is unknown. Dr. Duus is a fact witness who may have opinion testimony or inferences which are rationally based upon his perceptions, may be helpful to a clear understanding of his testimony and the determination of fact in this matter and may or may not be based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Docket No. 119*, at p. 9 of 12.

Following the parties' consent, we ruled upon Gold Cross' Motions *in limine*, including the Motion to exclude Dr. Duus as an expert witness, by Order dated August 12, 2009. See, *Docket No. 128*. Given the ambivalence of Lisdahl's position with respect to Dr. Duus, we expressed our ruling provisionally, as follows:

> If, as [Gold Cross] represent[s], Dr. Duus was not disclosed as an expert until the matter was first coming to Trial, and has not specified his expert opinions, and their bases, we are confident that Dr. Duus will not be providing expert opinion evidence at the time of Trial, absent compelling cause, and [Lis-

---

**23.** Strangely, Lisdahl makes the argument that, "[f]or many of the Gold Cross employees who observed David Johnson's treatment of Chad Lisdahl, it was nothing they had not seen before directed by Johnson towards Gold Cross employees who also served this country as Guardsmen and Reservists for the Army and the Airforce." *Lisdahl's Closing Argument, Docket No. 142*, at pp. 5–6 of 51. Even if that argument were true, Lisdahl has failed to produce any evidence that any other employee had left his or her job at Gold Cross owing to Johnson's alleged conduct. "Where employees are subjected to the same working conditions, 'no particular employee can claim that difficult working conditions signify the employer's intent to force that individual to resign." *Skare v. Extendicare Health Services,*

*Inc.*, 431 F.Supp.2d 969, 977 (D.Minn.2006), aff'd, 515 F.3d 836 (8th Cir.2008), quoting *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 797 (8th Cir.1996); see also, *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 473 (8th Cir.1990); *DeWitt v. Ridgeview Medical Center*, 2004 WL 2237071 at *5 (D.Minn., September 28, 2004). On this independent basis, even if we were to assume, as Lisdahl urges—which is an assumption that is not supported by this Record—that Johnson was grossly abrasive in the workplace, we would, nevertheless, by compelled by the law of this Circuit to conclude that Lisdahl has still failed to demonstrate a viable constructive discharge claim, since his complaints of abuse have no objective basis.

dahl] raises no such showing at this time.

In this Circuit, the Courts do not countenance, let alone encourage, Trials by ambush, and the failure to properly, and timely, disclose expert opinion evidence, results in its exclusion. See, e.g., *White v. Howmedica, Inc.,* 490 F.3d 1014, 1016 (8th Cir.2007)("The district court was within its discretion to exclude the Whites' untimely expert proffer because the Whites had ample time to comply with the district court's progression order."); *Marmo v. Tyson Fresh Meats, Inc.,* 457 F.3d 748, 760 (8th Cir.2006), citing *Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008–09 (8th Cir.1998); *Firefighter's Institute for Racial Equality ex rel. Anderson v. City of St. Louis,* 220 F.3d 898, 902 (8th Cir.2000), cert. denied, 532 U.S. 921 [121 S.Ct. 1359, 149 L.Ed.2d 288] (2001). Although [Lisdahl] failed to make any showing that the late disclosure of Dr. Duus was either substantially justified, or harmless, we do not foreclose the potential that such a showing could be made, but simply place [Lisdahl] on notice that he has a significant burden if he intends to show that Dr. Duus should be permitted to testify as an expert.

*Id.* at pp. 7–8 of 9.

As a consequence, we deferred a ruling on the Motion to exclude Dr. Duus' testimony until a ruling was necessary.

At no time has counsel for Lisdahl requested any extension in the applicable expert disclosure deadline, nor has he demonstrated that the failure to disclose Dr. Duus, and Dr. Duus' anticipated expert testimony, was either substantially justified, or harmless.[24] Given the conceded untimeliness of Dr. Duus as an expert witness, counsel for Lisdahl has not attempted to designate Dr. Duus as a lay expert witness, as such a designation would not elude the disclosure requirements that bar the doctor's testimony as an expert witness. As our Court of Appeals explained, in *Lake Home Products, LLC v. Sandee Mfg. Co.,* 2005 WL 1490312 at *6 (D. Minn., June 23, 2005):

Rule 26 states that a party must "disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence." Fed.R.Civ.P. 26(a)(2)(A). Federal Rules of Evidence 701 and 702 were "designed to prevent a party from using lay opinion testimony to subvert the disclosure and discovery requirements of [Rules 26 and 16] and the reliability requirements for expert testimony."

Quoting, *United States v. Martinez-Figueroa,* 363 F.3d 679, 682 (8th Cir.2004), judgment vacated on other grounds, 543 U.S. 1100, 125 S.Ct. 1020, 160 L.Ed.2d 1002 (2005)[quotation omitted in original].

As a result, having conceded that Dr. Duus' expert disclosures were untimely, whether Dr. Duus was considered a lay expert, or a scientific expert, counsel for Lisdahl had to identify some other basis to allow the admission of Dr. Duus' testimony.

What counsel for Lisdahl chose to do was to represent to the Court that Dr. Duus was a fact witness, who would only testify to facts, without any opinions. At the time of Trial, counsel for Lisdahl requested leave to provide an offer of proof as to Dr. Duus, and we granted leave to do

24. Given the circumstances presented here, it would be extremely difficult for Lisdahl to demonstrate that the disclosures were untimely due to any fault on Dr. Duus' part, as the report of Dr. Duus, which Lisdahl proffered for admission, is dated February 25, 2008, well before Lisdahl's expert disclosure deadline. See, *Plaintiff Exh. 54* [marked, but not admitted].

so. "The purpose of an offer of proof is to inform the court and opposing counsel of the substance of the excluded evidence and to provide the appellate court with a record sufficient to allow it to determine if the exclusion was erroneous." *United States v. Elbert*, 561 F.3d 771, 775 (8th Cir.2009), quoting *Ulmer v. Associated Dry Goods Corp.*, 823 F.2d 1278, 1283 n. 2 (8th Cir. 1987); *Kline v. City of Kansas City, Fire Dep't*, 175 F.3d 660, 665 (8th Cir.1999), cert. denied, 528 U.S. 1155, 120 S.Ct. 1160, 145 L.Ed.2d 1072 (2000)("An offer of proof serves dual purposes: (1) to inform the [trial] court and opposing counsel of the substance of the excluded evidence, enabling them to take appropriate action; and (2) to provide an appellate court with a record allowing it to determine whether the exclusion was erroneous and whether [the] appellant was prejudiced by the exclusion."), quoting *Thomas v. Wyrick*, 687 F.2d 235, 239 (8th Cir.1982), cert. denied, 459 U.S. 1175, 103 S.Ct. 824, 74 L.Ed.2d 1020 (1983).

Unfortunately, by way of an offer of proof, counsel for Lisdahl proposed that the Court allow him to take the direct examination of Dr. Duus—a proposal we rejected as wholly inefficient. Instead of then responding to the Court's concerns, that the battery of tests, which Dr. Duus administered to Lisdahl, were unknown to the Court, and the numerical values, that were purportedly obtained from those tests, were uninformative, counsel for Lisdahl simply assured the Court that those "facts" should be allowed into evidence. Of course, any such "facts" are immaterial unless they are explained, and their reliability demonstrated by the testimony of one trained in that science—otherwise, the Record only contains unenlightening numerical values. "As a general rule, expert testimony is admissible if it is relevant, helpful to the [factfinder] and will not confuse the [factfinder]." *United States v. Shedlock*, 62 F.3d 214, 219 (8th Cir.1995), citing *Rule 702. Federal Rules of Evidence*, "Expert testimony is helpful to the [factfinder] if it concerns matters beyond the knowledge of average individuals; however, it cannot supplant the [factfinder]'s role in evaluating the evidence." *Id.*, citing *United States v. French*, 12 F.3d 114, 116 (8th Cir.1993); see also, *United States v. Santana*, 150 F.3d 860, 863 (8th Cir.1998).

While the offer of proof of Lisdahl's counsel was singularly uninformative, we can glean from Dr. Duus' report, which was marked as Plaintiff Exhibit 54, but not received into evidence, some sense of what Lisdahl intended to adduce through Dr. Duus' testimony. As we expressed at the time of Lisdahl's proffer, Dr. Duus' selection of psychological tests, and any numbers produced by those tests, are wholly meaningless to the Court and, without requisite expertise, the report's proffer is senseless. The finder-of-fact, whether a Court, or Jury, is prohibited from undertaking its own, independent investigation of the facts of a lawsuit. Although we have access to, and have routinely employed, various psychological treatises, in order to understand the legal implications of certain psychological symptomatology, Lisdahl has no right to expect the Court, or a Jury for that matter, to search out the meaning of specific psychological parameters, unaided by specialized expertise.[25] Moreover, we are unable to fathom why

---

**25.** As but one example, we noted during the proffer of Dr. Duus, that we had no means to determine whether the psychological tests, which Dr. Duus administered, had been independently scored, or whether they were graded by Dr. Duus, himself, and we certainly did not know whether the approach taken would introduce, or potentiate toward, bias in the results obtained. Dr. Duus would not be offering "facts," but would be testifying to his opinions.

Dr. Duus' testimony would be offered, unless it was to undermine Lisdahl's sworn attestations to the VA, in which case, Dr. Duus' report should be presented to that agency, for a reconsideration, if one is warranted, of Lisdahl's entitlement to the VA benefits that he has claimed.

On the Record presented, we conclude that Dr. Duus was properly excluded from testifying at Trial, as the effort to admit his testimony was a subversion of the disclosure requirements imposed upon all litigants. "Discovery of expert opinion must not be allowed to degenerate into a game of evasion," as "[t]he purpose of our modern discovery procedure is to narrow the issues, **to eliminate surprise,** and to achieve substantial justice." *Tenbarge v. Ames Taping Tool Systems, Inc.*, 190 F.3d 862, 865 (8th Cir.1999)[emphasis in original], quoting *Voegeli v. Lewis*, 568 F.2d 89, 97 (8th Cir.1977), and *Mawby v. United States*, 999 F.2d 1252, 1254 (8th Cir.1993), quoting, in turn, *Greyhound Lines, Inc. v. Miller*, 402 F.2d 134, 143 (8th Cir.1968). Allowing Dr. Duus' testimony would not assist the Court, and would unfairly prejudice Gold Cross which, by every appearance, relied upon the fact that Lisdahl had not timely disclosed any intention to call a psychological expert to testify at Trial. If Dr. Duus' testimony had any materiality to the issues here tried, we are confident that the diligent attorney would have properly, and fully, disclosed those opinions on a timely basis.